UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSHUA LEE HOSKINS, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> SETH MERACLE, CHAD ADAMS, ) <br> MICHAEL BAILEY, PHILLIP BAKER, ) <br> MICHAEL BARTOLOTTI, MARK ) <br> BELL, DAVID BROCK, SHAWN ) <br> BROWN, JUSTIN BRYANT, JOSEPH ) <br> DUDEK, JAMES GROVES, AUSTIN ) <br> HAGSTON, GARRICK HALE, JARED ) <br> HANKINS, DANIEL J. HARRISS, ) <br> CHARLES HECK, KALE LIVELY, ) <br> BRANDON LUEKER, ANTHONY ) <br> MAYS, BRIAN MILLER, PATRICK ) <br> PEEK, SCOTT PETITJEAN, ) <br> ALEXANDER RODMAN, WESLEY ) <br> SHIRLEY, CHARLES SWISHER, ) <br> CHAD WALL, DONALD WANACK, ) <br> ERIC WANGLER, PERCY MYERS, ) <br> JANA RUETER, and BOB BLUM, ) <br> ) <br> Defendants. ) | Case No. 3:20-cv-00788-GCS |

## MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

Plaintiff Joshua Hoskins, an inmate in the custody of the Illinois Department of Corrections ("IDOC") currently incarcerated at Dixon Correctional Center, brought suit against Defendants on August 17, 2020, for allegations stemming from actions against Plaintiff while he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"). (Doc. 1). On March 26, 2021, Plaintiff filed an amended complaint, in

which he brings two counts against all defendants pursuant to 42 U.S.C. § 1983: (i) a First Amendment retaliation claim, and (ii) an Eighth Amendment claim for deliberate indifference to a serious medical need. *Id.* at p. 4.

Now before the Court is a motion for summary judgment on the issue of exhaustion of administrative remedies by Defendants Meracle, Adams, Bailey, Baker, Bartolotti, Bell, Brock, Brown, Bryant, Dudek, Groves, Hagston, Hale, Hankins, Harriss, Heck, Lively, Lueker, Mays, Miller, Peek, Petitjean, Rodman, Shirley, Swisher, Wall, Wanack, and Wangler (the "IDOC Defendants"). (Doc. 79). Also before the Court is a motion for summary judgment on the issue of exhaustion of administrative remedies filed by Defendants Myers, Rueter, and Blum (the "Wexford Defendants"). (Doc. 68). For the reasons outlined below, both motions are **GRANTED.**

## FACTUAL BACKGROUND

Plaintiff alleges that between June 17, 2020 and August 17, 2020, Defendants Brock, Swisher, Grove, Harriss, Heck, Wanack, Wangler, Wall, Adams, Reuter, Hagston, Lueker, Baker, Meracle, Miller, Lively, Bailey, Shirley, Mays, Dudek, Hale, Rodman, Bell, Blum, Myers, and Petitjean each informed Plaintiff that he would not be able to use showers; would not be assigned hygiene items, underwear, or bedsheets; and would not be able to submit sick call slips because Plaintiff filed grievances and lawsuits against the defendants. *Id.* at p. 2. On June 30, 2020, Plaintiff claims Defendant Shirley also threatened to have Plaintiff assaulted if he complained to Defendant Adams again. *Id.* at p. 3.

Defendant Rodman also allegedly told Plaintiff that he was eligible for housing in a lower-security-level institution, but that he and Defendant Brown would cause Plaintiff

to be transferred to a medium-security institution instead. (Doc. 25, p. 3). On July 14, July 21, and August 4, 2020, Plaintiff asserts that Defendants Myers and Blum told Plaintiff that they and Defendant Rueter had restricted him from receiving medical care due to his grievances and lawsuits. *Id*. At the same time, Defendant Rodman stated that Plaintiff would be housed with Defendant Baker, despite the knowledge that his safety would be in danger if so housed. *Id*.

Between August 27 and September 12, 2020, Plaintiff asserts that Defendants Brown, Bryant, Bartolotti, and Hankins each told Plaintiff that they had instructed staff to deny Plaintiff access to showers, hygiene items, underwear, or bedsheets. (Doc. 25, p. 3). They also stated that Plaintiff could not submit sick call slips due to his grievance and lawsuit activity. *Id*. Finally, on October 19, 2020, Plaintiff states that Defendant Rodman told Plaintiff that if he tried to use the showers or place sick call slips, Defendant Rodman would fabricate disciplinary tickets against Plaintiff so that he would be denied institution jobs. *Id*. According to Plaintiff, Defendant Rodman made this threat because Plaintiff filed grievances and brought litigation against the defendants. *Id*.

The IDOC Defendants identified 4 grievances Plaintiff filed which are relevant to this case. *See* (Doc. 80, p. 3-4). On June 17, 2020, Plaintiff field a grievance stating that when he left segregation, he did not have any bedding (the "June 17th grievance"). (Doc. 82, hereinafter "Exhibit A," p. 155-156). However, Plaintiff did not claim that any of the defendants withheld his bedding in retaliation for the filing of any grievances. *Id*. The Grievance Officer responded to Plaintiff's grievance on August 14, 2020, noting that Plaintiff's personal property file did not indicate that any of the items listed were

confiscated when Plaintiff first entered segregation. *Id.* at p. 154. Accordingly, the Grievance Officer recommended the grievance be denied. *Id.* On August 18, 2020, the Chief Administrative Officer ("CAO") concurred. *Id.* Although Plaintiff's cumulative counseling summary contains notes indicating when other grievances were returned to Plaintiff, there is no indication in the summary that this grievance was returned. *See, e.g.*, (Doc. 69, Exh. A, p. 9)(last noting that the June 17th grievance was received for second-level review on July 29, 2020). Plaintiff did not appeal this grievance to the Administrative Review Board ("ARB").

The IDOC Defendants next point to a July 6, 2020 grievance (the "July 6th grievance") in which Plaintiff stated that the defendants denied Plaintiff showers and hygiene items in retaliation for his extensive litigation history. (Doc. 80, p. 3). The IDOC Defendants claim that Plaintiff did not appeal this grievance to the ARB after receiving a response from the second-level review at Pinckneyville. *Id.* In support of this claim, the IDOC Defendants cite to "Exhibit B" and "*Id.*" As the most recent full citation in the IDOC Defendants' motion was to "Exhibit A" at 001527-001530, (Doc. 82, Exh. A, p. 155-156), the Court began by reviewing Exhibit A for this grievance; however, this grievance was not found in Exhibit A. The Court then reviewed the IDOC Defendants' four separate Exhibit Bs, (Doc. 83, 84, 85, 86); however, none of these documents had a grievance dated July 6, 2020. The IDOC Defendants' unnamed sixth exhibit (Doc. 87) likewise did not contain a July 6, 2020 grievance. The Wexford Defendants include a grievance dated July 6, 2020 in their exhibits (the "Wexford Defendants' July 6th grievance"); in this grievance, Plaintiff claims that the grievance office at Pinckneyville failed to respond to Plaintiff's

prior grievances. (Doc. 69, Exh. B, p. 222). Plaintiff does not describe instances of retaliation. *Id*. This grievance was not appealed beyond second-level review. *Id*.

During the hearing, Plaintiff referenced a July 6, 2020 grievance in which the counselor told Plaintiff to provide the dates of the incidents at issue. This response matches with the July 6, 2020 grievance the Wexford Defendants provided. (Doc. 69, Exh. B, p. 222-223). Plaintiff confirmed that he wrote grievances on July 6th, July 14th, and August 3rd. *Id*. at p. 7. However, he also stated that he did not submit the "July 6th grievance" to the Grievance Officer.

On July 14, 2020, Plaintiff filed a grievance in which he stated that grievances he previously filed in June and July 2020 against the IDOC Defendants for preventing him from practicing his faith had gone unanswered. (Doc. 82, p. 160-161). The provided July 14th grievance concerns Plaintiff's right to practice his religion. This grievance was denied for failing to include dates, and Plaintiff did not appeal this grievance to the next level. (Doc. 82, p. 160-161). Plaintiff confirmed at the hearing that he did not send a July 14, 2020 grievance to the Grievance Officer. (Doc. 118, p. 7).

The last relevant grievance to which the IDOC Defendants reference is a grievance Plaintiff filed on August 3, 2020 (the "August 3rd grievance"). (Doc. 80, p. 4). In this grievance, Plaintiff states that he has been denied basic necessities and access to medical care; however, he states that he was denied these items due to "staff conduct of not allowing me to practice my faith." (Doc. 82, p. 150). He also states that the IDOC Defendants, whom he listed by name, retaliated against him for writing grievances. *Id*. at p. 151. The counselor who reviewed this grievance denied it for a failure to include the

dates when the incidents allegedly occurred. *Id*. Plaintiff admitted at the hearing that he did not appeal this grievance to the Grievance Officer or to the ARB. (Doc. 118, p. 8).

During the hearing, Plaintiff claimed that he filed additional grievances regarding the IDOC and Wexford Defendants' conduct in June, July, and August 2020, but he did not receive responses to those grievances. (Doc. 118, p. 9). Plaintiff also claims that he filed grievances regarding the behavior of Defendants Brown, Bartolotti, Hankins, and Bryan in August 2020, but he did not receive responses to those grievances. *Id*. at p. 12-13. However, Plaintiff also states that he did receive his grievances back from Counselor Hallman. (Doc. 118, p. 13). Plaintiff does not state whether these returned grievances included a response, when those grievances were returned, or whether he appealed those grievances if denied.

Plaintiff's grievance file does include a September 8, 2020 grievance in which he claims that he filed a grievance on August 22, 2020, but he did not receive a grievance number for the claim. (Doc. 90, p. 35). Plaintiff does describe retaliation by some of the defendants in this case in that grievance. *Id.* However, this grievance does not list Defendants Brown, Bartolotti, Hankins, or Bryant, and the date of August 22, 2020 predates when Plaintiff claims that these defendants violated his rights. *Id*. at p. 35-36. Although Plaintiff explained during the hearing that he keeps notes about his grievances when writing them, he also stated that he would destroy his notes after writing the grievance. (Doc. 118, p. 18). Plaintiff could not locate any notes about grievances he filed for this case. *Id*. at p. 19. Furthermore, each time Plaintiff grieved about his missing grievances, the Grievance Officer responded that Plaintiff either had no open grievances

or had open grievances which the office was still reviewing and for which Plaintiff had received a receipt. (Doc. 69, Exh. A). Plaintiff also testified that he wrote grievances on the dates that the incidents about which he grieved had occurred. (Doc. 118, p. 18). In this case, those dates would be June 17th, June 30th, July 13th, July 14th, July 21st, August 4th, August 27th, September 30th, and October 19th, 2020. The only dates for which Plaintiff's file contain grievances are June 17th and July 14th. *See* (Doc. 69, Exh. A).

      The Wexford Defendants do not identify additional relevant grievances in this case. (Doc. 69, p. 2-7). However, they do point out that Plaintiff submitted no grievance to the ARB regarding the allegations against the Wexford Defendants in this complaint during the relevant time period. *Id*. at p. 6. He also failed to submit any grievance to the Chief Administrative Officer for review regarding the complaints against the Wexford Defendants. *Id*. Furthermore, the Wexford Defendants point out that Plaintiff's cumulative counseling summary notes that on December 30, 2020, Plaintiff admitted to Counselor Hallman that he knew Mr. Hallman was not destroying his grievances, but that Plaintiff wanted it to look that way so he could succeed on his lawsuits. *Id*. On January 14, 2021, the cumulative counseling summary records that Plaintiff asked Mr. Hallman to throw his grievances away; however, Counselor Hallman told Plaintiff that all grievances placed in the grievance box would be processed according to policy and procedure. *Id*. On February 22, 2021, the cumulative counseling summary notes that Plaintiff told Counselor Hallman that he did not appreciate the note memorializing that Plaintiff asked Mr. Hallman to destroy his grievances, and that Plaintiff thought Mr. Hallman would assist him with his lawsuits. *Id*. at p. 7.

Plaintiff contends that counselors did not return grievances which may "get the staff in trouble." (Doc. 118, p. 13). Therefore, when he wrote grievances which did not state that a specific counselor was denying him access to the grievance process, he would get a response from the grievance office. *Id*. Plaintiff further contends that Counselor Hallman falsified his cumulative counseling summary to include references to Plaintiff asking Counselor Hallman to destroy his grievances. *Id*. at p. 15. However, Plaintiff also states that Counselor Hallman never admitted to destroying any of Plaintiff's grievances, and that there is no evidence that Counselor Hallman ever knew about Plaintiff's grievances. *Id*. at p. 16.

At the hearing, Plaintiff called Ms. Shayne Mercier and Ms. Amy Hill as witnesses. Ms. Mercier is a grievance officer at Pinckneyville. (Doc. 118, p. 28). When asked about the procedure for missing grievances, Ms. Mercier explained that she personally told Plaintiff to refile his grievances if he did not receive a response within forty-eight hours of initially submitting the grievances. *Id*. at p. 30. She also explained how the grievance office processes grievances. Grievances are first collected in the housing unit before being brought directly to the grievance office; the grievance office then records the grievances and sends receipts. *Id*. at p. 31. However, counselors who collect grievances do have a key to the box in which grievances are placed. *Id*.

Ms. Mercier stated that if an inmate asked her to throw his grievances away, she would note the request and provide a response stating that the inmate wanted to disregard the grievance. (Doc. 118, p. 35). She also explained that counselors and grievance officers cannot discover whether an inmate has a lawsuit pending against a

member of the prison staff without talking to the inmate. *Id.* at p. 37. Counselors and Grievance Officers do not have access to that information, and administration is not permitted to share that information if they have access to it. *Id.*

When asked about the process by which an inmate would mail appeals of a grievance to the ARB, Ms. Mercier noted that the facility is obligated to mail out grievances for the prisoners. (Doc. 118, p. 41-42). However, inmates are expected to make copies of their grievances on their own. *Id.* at p. 42. If an inmate is indigent, then that inmate may receive assistance with postage or filing fees. *Id.*

Ms. Hill testified that she is currently employed as a counselor at Pinckneyville. (Doc. 118, p. 43). She explained that she needed an inmate to provide general dates when asking about missing grievances; when she had those dates, she could ask the Grievance Officer whether that inmate had any open grievances fitting that timeframe. *Id.* at p. 46. She also explained that if an inmate wrote a grievance stating that he had previously filed a grievance for misconduct, but he had not received a response to that previously filed grievance, then the second grievance would act as a request slip because it would not be addressed to the officer accused of misconduct. *Id.* at p. 47. If an inmate had requested that she throw away or destroy grievances, Ms. Hill explained that she would have noted the request in the inmate's cumulative counseling summary. *Id.* at p. 48. Ms. Hill further confirmed that when counselors come to cell houses to collect grievances, they have keys to the grievance box. *Id.* Finally, Ms. Hill stated that she was not aware that Plaintiff had any pending lawsuits against Pinckneyville staff while he was housed at Pinckneyville. *Id.* at p. 50.

## LEGAL STANDARDS

Summary judgment is proper when a moving party demonstrates that the record cannot establish the presence of a genuine dispute of material fact. *See* FED. R. CIV. PROC. 56(a). In order to survive a motion for summary judgment, the non-moving party must provide admissible evidence from which a reasonable jury could find in favor of the non-moving party. *See Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008). Traditionally, the Court's role in determining a motion for summary judgment is not to evaluate the weight of the evidence, judge witness credibility, or determine the truth of the matter, but is instead to determine whether there is a genuine issue of material fact. *See Nat'l Athletic Sportwear Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). However, in *Pavey v. Conley*, the Seventh Circuit held that a judge, rather than a jury, should determine whether factual issues relating to the defense of the failure to exhaust administrative remedies exist. 544 F.3d 739, 741 (7th Cir. 2008). If the Court determines that a prisoner did not exhaust his administrative remedies, the Court may select one of the three following outcomes: (a) if the plaintiff still has time to do so, the plaintiff must go back and exhaust his administrative remedies; (b) if the plaintiff's failure to exhaust was innocent, as where prison officials prevent a prisoner from exhausting his remedies, the plaintiff must be given another chance to exhaust; or (c) if the failure to exhaust was the prisoner's fault, the case is over. *Id.* at 742.

The Prisoner Litigation Reform Act ("PLRA") governs lawsuits filed by inmates and states that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted."42 U.S.C. § 1997e(a). In order to satisfy the PLRA's exhaustion requirement, prisoners must strictly adhere to the grievance process. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Prisoners must exhaust their remedies before filing suit. *See Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004). A plaintiff cannot file suit and then exhaust administrative remedies while that suit is pending. *Id*. Consequently, if a prisoner fails to use a prison's grievance process properly, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809.

Prisoners must follow a prison's administrative rules when exhausting their remedies. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1023 (7th Cir. 2002). As an inmate confined within the IDOC, Plaintiff is required to follow the regulations contained in the IDOC's Grievance Procedures for Offenders ("grievance procedures") in order to exhaust his claims properly. *See* 20 ILL. ADMIN. CODE § 504.800, *et seq*. The grievance procedures require prisoners to submit a grievance to a counselor within sixty days of discovering the underlying incident. *See* 20 ILL. ADMIN. CODE § 504.800. The grievance must state the "factual details regarding each aspect of the offender's complaint including what happened, when, the name of any individual involved, and where the incident occurred." 20 ILL. ADMIN. CODE § 504.810(a). If a prisoner is not satisfied with the counselor's response, then that prisoner can submit a formal grievance to the prison's grievance officer. *Id*. at (a)-(b). The officer must then review the grievance and provide a written response to the inmate. *See* 20 ILL. ADMIN. CODE § 504.830(a). Within two months of receipt of the grievance, when reasonably feasible under the circumstances, the grievance

officer must report findings and recommendations in writing to the Chief Administrative Officer ("CAO"). *See* 20 ILL. ADMIN. CODE § 504.830(e). If the prisoner is still not satisfied with the CAO's decision, the prisoner can formally appeal to the Director through the ARB within thirty days of the CAO's decision. *See* 20 ILL. ADMIN. CODE § 504.850(a). The inmate must attach copies of the grievance officer's report and the CAO's decision to the appeal. *Id.* The ARB then submits its recommendation to the Director, who is then responsible for issuing the IDOC's final decision. *See* 20 ILL. ADMIN. CODE § 504.850(f).

The grievance process also permits an inmate to file an emergency grievance directly to the CAO. *See* 20 ILL. ADMIN. CODE § 504.840(a). The CAO may determine if there is a substantial risk of imminent personal injury or other serious harm to the offender. *Id.* If the CAO determines that the grievance is a non-emergency, the prisoner is notified in writing that the prisoner may resubmit the grievance as a non-emergency and move forward with the standard grievance process. *See* 20 ILL. ADMIN. CODE § 504.840(c).

The statutory purpose of the PLRA is to "afford corrections officials [the] time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006); *see also Begolli v. Home Depot U.S.A., Inc.,* 701 F.3d 1158, 1161 (7th Cir. 2012). This allows the prison administration an opportunity to fix the problem or to reduce damages and to shed light on factual disputes that may arise in litigation. *See Pozo*, 286 F.3d at 1023-24. To allow otherwise would frustrate the purpose of the grievance process. *See Porter v. Nussle*, 534 U.S. 516, 526 (2002). Accordingly, a prisoner cannot satisfy the exhaustion requirement by filing an untimely or otherwise

procedurally defective grievance. *See Woodford*, 548 U.S. at 83. Unless a prisoner completes the administrative review process by following the rules established for that process, exhaustion has not occurred. *See Pozo*, 286 F.3d at 1023.

## ANALYSIS

Both the IDOC Defendants and the Wexford Defendants argue that Plaintiff has failed to exhaust his administrative remedies. They first argue that Plaintiff did not appeal any relevant grievances to the ARB, thus leaving his grievances unexhausted. (Doc. 80, p. 7-8); (Doc. 69, p. 11-13). They also argue that Plaintiff did not wait a sufficient amount of time to receive a response to his grievance before filing suit to determine that his administrative remedies were unavailable to him. *Id.* Because Plaintiff filed his lawsuit prematurely, the Court finds that his grievances were unexhausted at the time he filed suit. Furthermore, the Court finds that Plaintiff's allegations that counselors would destroy his grievances are not credible.

There are three circumstances in which an administrative remedy is not capable of use to obtain relief (and therefore unavailable): (i) when the remedy operates as "a simple dead end," in which officers are unable or unwilling to provide relief; (ii) when, though mechanisms exist through which inmates can technically obtain relief, the mechanisms are so opaque no ordinary inmate can navigate them; or (iii) when prison administrators thwart an inmate's attempt to take advantage of available remedies through "machination, misrepresentation or intimidation." *Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016); *see also Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2008); *Pavey*, 544 F.3d at 742; *Dole* 438 F.3d at 808. When a plaintiff properly follows the procedure for exhausting

administrative remedies, but prison officials mishandle the grievance, the remedy is rendered unavailable. *See Dole*, 438 F.3d at 811. For example, if the ARB rejected an appeal on the basis of a grievance officer's misidentification of the inmate's prison number, a plaintiff could argue that this mistake rendered his attempts to exhaust his administrative remedies thwarted. *See Ross v. Bock*, No. 16 C 8672, 2017 WL 6758394, at *3 (N.D. Ill. Nov. 29, 2017).

If grievance personnel do not respond to an inmate's grievance, that inmate's administrative remedies are also rendered unavailable. *See Dole*, 483 F.3d at 809. However, in order for an inmate's remedies to be unavailable due to lack of a response, an inmate must have no indication that officials are pursuing his case. *See Reid v. Balota*, 962 F.3d 325, 331 (7th Cir. 2020). For example, when prison officials state that they will inform an inmate of the status of his or her grievance within sixty days, "whenever possible," a period of silence exceeding six months nevertheless does not render remedies unavailable because officials may still be investigating a complicated case. *Ford*, 362 F.3d at 400. In contrast, in *Reid*, the Seventh Circuit Court of Appeals found that a two-month period of silence rendered administrative remedies unavailable only because the inmate had no reason to believe that anyone was "looking into" his grievance. 962 F.3d at 331.

It is true that prison officials may, in some circumstances, render a prisoner's administrative remedies unavailable by failing to respond to a grievance. However, a court cannot find that the administrative process was not available when a prisoner rushed to court to file a lawsuit shortly after an administrative response was required.

*See, e.g.*, *Mlaska v. Shah,* Nos. 10-2255, 10-2401, 10-3795, 428 Fed. Appx. 642, 645 (7th Cir. June 29, 2011)(stating that prisoner failed to exhaust where, at best, he filed lawsuit one month after the warden's 60–day response period elapsed); *Jamison v. Franko*, No. 12 C 0242, 2013 WL 5166626, at *3 (N.D. Ill. Sept. 13, 2013)(noting that prisoner failed to exhaust where he filed suit less than two weeks after the 30–day response period had elapsed); *Gregory v. Santos*, No. 07-669-JPG-CJP, 2010 WL 750047, at *6 (S.D. Ill. Jan. 19, 2010)(stating that prisoner failed to exhaust where he gave the ARB "only a few days leeway beyond the six-month period"). Instead, prisoners must file suit only after a sufficient period of time has elapsed for a required administrative response. *See, e.g., Kyles v. Mathy,* No. 09–1084, 2010 WL 3025109, at *4 (C.D. Ill. Aug. 2, 2010)(noting that a prisoner exhausted his administrative remedies when he waited approximately one and a half months after the expiration of the two-month response deadline before moving on to the next step of the grievance process); *Green v. Hartman,* No. 04 C 4304, 2006 WL 2699336, at *3 (N.D. Ill. Sept. 18, 2006)(finding that prisoner exhausted where he waited to file suit until two months after the expiration of the 30–day response deadline); *Goodman v. Carter,* No. 2000 C 948, 2001 WL 755137, at *3 (N.D. Ill. July 2, 2001)(noting that prisoner exhausted where he waited to file suit until 45 days after the warden's response was due). In Illinois, grievances officers are generally permitted sixty days in which to report his or her findings and recommendations to the CAO. *See* 20 ILL. ADMIN. CODE § 504.830(e).

Both the IDOC Defendants and the Wexford Defendants point out that Plaintiff first brought suit against the defendants approximately twenty-five to forty-eight days before the IDOC owed Plaintiff a response to his grievance. *See* (Doc. 69, p. 13). This is

assuming, in Plaintiff's favor, that he did file grievances on the dates of the alleged misconduct, but that he did not receive a response from the grievance office. Further, Plaintiff amended his complaint less than six weeks after his amended allegations had ended. (Doc. 80, p. 8). This left the grievance office an additional eighteen days by which it may have responded to Plaintiff's grievances by its own administrative rules. As Plaintiff did not permit the Pinckneyville grievance office a sufficient amount of time to respond to his grievances before filing suit, the Court finds that his grievances remain unexhausted.

Plaintiff contends that even if he had waited the full amount of time before filing suit, he would not have received a response from the grievance office because counselors intentionally destroyed or misplaced his grievances in order to protect fellow Pinckneyville staff. *See* (Doc. 90). If correct, this allegation could render the grievance process a "simple dead end" for Plaintiff and make the exhaustion of his remedies futile. However, the Court does not find that Plaintiff's allegations of misconduct are credible. Plaintiff's counselor, Mr. Hallman, recorded in Plaintiff's cumulative counseling summary that Plaintiff had asked him to destroy his grievances in order to help him with an upcoming lawsuit. (Doc. 69, Exh. A). Although Plaintiff testified that he believed Counselor Hallman did not truthfully record this statement, both Ms. Mercier and Ms. Hill explained that when an inmate tells a counselor to disregard their grievances, they would make a note of it in the inmate's counseling summary, just as Counselor Hallman did in this case. The Court finds that Ms. Mercier's and Ms. Hill's testimony supports the veracity of Counselor Hallman's report.

As the Wexford Defendants point out, in this case, Plaintiff filed a grievance requesting that mental health staff be investigated for alleged misconduct – a claim that would certainly "get staff in trouble," but to which the grievance office nevertheless responded during the timeframe at issue. The Court finds that this undercuts Plaintiff's claim that grievance officials would destroy his grievances to protect other staff members. As Plaintiff's claims regarding the futility of the grievance process are not credible, the Court finds that Plaintiff failed to exhaust his administrative remedies, and summary judgment is appropriate.

## CONCLUSION

For the above stated reasons, Defendants' motions for summary judgment for failure to exhaust administrative remedies (Doc. 68, Doc. 79) are **GRANTED.** The Court directs the Clerk of the Court to dismiss this case without prejudice.

**IT IS SO ORDERED.**

**DATED:  August 2, 2022.**

Digitally signed by Judge Sison 2
Date: 2022.08.02 08:17:08 -05'00'

**GILBERT C. SISON**
**United States Magistrate Judge**